MENDON SAV. BANK, Ex parte. See Case No. 9,555.

MENEDGER (HOPKINS v.). See Case No. 9,289.

MENEDGER (MATTHEWS v.). See Case No. 9,289.

---

## Case No. 9,427.

### The MENTOR.

[4 Mason, 84.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1825.

SEAMEN—WAGES—FORFEITURE—REMITTED— EARNED SUBSEQUENTLY—SET-OFF.

1. Wages of seamen are forfeited for gross offences; but not for slight faults, either of neglect or disobedience. There must be either an habitual neglect or disobedience, or a single act of a heinous and aggravated nature.
[Cited in The Maria, Case No. 9,074; Freeman v. Baker, Id. 5,084; Fuller v. Colby, Id. 5,149. Followed in The Almatia, Id. 254. Cited in The San Marcos, 27 Fed. 569; The Idlehour, 63 Fed. 1019.]

2. A master has power to remit a forfeiture; and his pardon is a redintegration of the seamen in the right of wages.
[Cited in The Olive Chamberlain, Case No. 10,491.]

3. Repentance and tender of amends reinstate the claim for wages.

4. If the articles prohibit any traffic by the seamen under forfeiture of wages, yet the master may remit the forfeiture.
[Cited in The San Marcos, 27 Fed. 569.]

5. A master has no right to degrade the ship's carpenter without sufficient cause.

6. Wages forfeited for an offence are only such as are earned antecedently, and not subsequently to the offence. In general, set-offs are not admissible in the admiralty.
[Cited in Pitman v. Hooper, Case No. 11,186; Smith v. Treat, Id. 13,117; The Hudson, Id. 6,831.]

[Appeal from the district court of the United States for the district of Massachusetts.]

Libel for seamen's wages on a voyage from Boston to the Sandwich Islands, Northwest Coast, and Canton in China, and thence back to Boston. There was a special answer put in by the owners, contesting the right to wages on various grounds, some applicable to all, and some to part only of the libellants. In substance it stated: (1) That the libellants, together with one Sheridan and Rodman, also mariners on board said vessel, entered into a confederacy and conspiracy to disobey and unlawfully resist the lawful authority of [Hersey] the master of said vessel, and did violently and forcibly resist his authority, whereby the lives of the officers, passengers, and crew of said ship, and the ship itself and a valuable cargo on board were greatly endangered; and the master, for that cause alone, was obliged to put into the port of St. Helena. And the respondents maintained, that according to the contract made by the libellants, as well as by the general rules of the maritime law, they had forfeited their wages by such mutinous conduct. (2) That said forfeiture was never remitted by the master; that the libellants were permitted to return home in, and assist in the navigation of, said vessel, under the express declaration of the master, and upon a condition understood and assented to by the libellants, that this should not be deemed to operate as a release or remission of any forfeiture of wages, or other penal consequences of their misconduct. (3) That the libellants ought not to recover any sum by way of wages, even if they were not forfeited by such misconduct, because the respondents had suffered damage by the misconduct and breach of duty of the libellants to an amount exceeding the sums so claimed for wages. (4) That as to the claim of Woodward, if the same were allowed at all, it should be allowed for the sum claimed; because the said Woodward had shipped to perform the duty of a carpenter at a high rate of wages; and being found incompetent to such duty, very early in the voyage relinquished his situation as carpenter, and took that of an ordinary seaman. A decree was rendered pro forma by consent of parties, in the district court, in favor of the libellants.

Bassett & Gay, for libellants.
Lemuel Shaw, for respondents.

---

[1] [Reported by William P. Mason, Esq.]

STORY, Circuit Justice. The present is a suit brought by William Woodward, John H. Hemmer, Artemas Gulliver, and William Brown, for the recovery of wages alleged by them, in their summary petition, to have been earned on a long and circuitous voyage in the ship Mentor, from Boston to the Sandwich Islands, to the Northwest Coast, to Canton in China, and from thence back again to Boston. The voyage has been completed by the return of the ship to Boston, and the libel seeks a decree in rem for the wages asserted to be due. There is a very special answer put in by the owners, asserting, that all the libellants have forfeited their wages by reason of a gross combination, and endeavour to commit a revolt, on board of the ship on the homeward voyage, which is set forth in the defensive allegation with all due circumstantiality. There are other separate allegations, in respect to two of the libellants, viz. Hemmer and Woodward, which I shall have occasion hereafter to notice, when I come particularly to examine the special merits of their claims.

It need hardly be stated, that in this court, seamen, as a class of persons, are entitled to receive peculiar indulgence. Their habits of life, their incessant and 'laborious service, their frequent exposure to peril of no ordinary character, their intrepidity and thoughtlessness, their hardihood, sometimes approaching almost from necessity to ferocity, and their profuse and often captivating gallantry, give a colouring to their characters so mixed and variable, so full of lights and shades, that it requires the intimate knowledge of a court of admiralty duly to estimate both their frailties and their merits. They partake, in short, somewhat of the boisterousness of the element which they navigate; and their acts must be judged of, not by the courtesy, or the rigid exactions of domestic society, but by that milder judgment, which winks at their errors, and mitigates its own resentment in consideration of the provocations, temptations, and personal infirmities incident to their employment. To visit all their ill-advised, and even mischievous conduct with severe penalties, would be most discouraging to the maritime service of the country, and perhaps fatal to the safety, as well as the enterprise of our commerce. To indulge them in gross misdemeanors, without adequate correction, would be to create mutinies, and overturn the discipline of the ship, and thereby open a path to the destruction, both of the property and the persons on board. The marine law has therefore, in cases of this nature, adopted a milder course. It punishes gross and obstinate offences with a forfeiture of wages, especially if they are persisted in without repentance or amends. It treats lighter faults with an indulgent lenity, allowing compensation for any losses and expenses caused by them; passing over slight errors, unaccompanied with mischief, without notice; and correcting habitual neglect, or incompetent performance of duty, when it amounts only to levissima culpa, by a correspondent diminution of wages.

On the other hand, it is the disposition of the court to uphold, with a firm hand, a reasonable exercise of the authority committed to the master and other officers of the ship. It views a prompt and cheerful obedience of orders, on the part of the seamen, as of the deepest importance. It admits of no slight excuses for a slow or reluctant fulfilment of duty, and weighs not with a scrupulous nicety the language of the command, or the necessity of the service. Occasional harshness in manner or matter, occasional ebullitions of passion, and other infirmities, incident to nautical life, are not admitted as justifications of insubordination; but are deemed not wholly inexcusable, unless they degenerate into wanton and malicious abuse, or illegal severity.

The very necessities of the sea service require this stubborn support of authority. On the ocean the officers can have but little physical power compared with that of the crew. They may, at any time, become the victims of a general conspiracy to revolt; and unless they can subdue obstinacy and indolence by the moral influence of command, and enforce a prompt and uncomplaining obedience by punishment, the ship and cargo must soon be at the mercy of the winds and waves.

If these remarks are true in regard to voyages in general, they must apply with increased force to voyages of the description before the court, where savage countries are to be visited, and trade carried on with persons crafty, vindictive, and ferocious, and where the whole profits of the voyage depend upon vigilance, industry, and exclusive devotion to the interests of the ship.

The general matter of defence, as applicable to all the libellants, has been sufficiently established by the proofs in the cause. At the present term of the court the libellants have been tried and convicted upon an indictment for an endeavour to make a revolt on board of the ship; and by the consent of the parties the testimony brought to the knowledge of the court, upon that occasion, has been permitted to be adduced as evidence in the case now in judgment. It appears that, on the homeward voyage from Canton, while the ship was a little to the east of the Cape of Good Hope, on the 8th of June last, one of the seamen, by the name of Rodman, being dissatisfied with the usual allowance of fresh provisions on that day, sent a message to the captain, that if the crew had not more provisions allowed them, they would take it of themselves. On being sent for on account of this disrespectful language, he admitted he had used the expressions, and added, in the presence of the crew, who assembled themselves near him on the deck, that so he had said, and so they all had said, and now said. The captain then stated, that the crew had the usual al-

lowance; that he, Rodman, had been trying to make a revolt on board for some time, and that Hemmer, who was then present, was another damned rascal. Immediately another seaman, whose name was Sheridan, advanced towards the captain, and said, "We are no damned rascals." The captain put out his hand to press Sheridan back, who immediately struck the captain with his fist, in the face, several times, by which he received considerable injury, bleeding profusely at the nose. The captain then seized hold of Sheridan, who retreated backwards towards the forecastle of the ship, and in the struggle between him and the captain, both fell over the caboose, the captain being upon the top. Brown, Rodman, and Woodward then took hold of the captain, and endeavored to disengage Sheridan from him, and finally succeeded in their efforts, notwithstanding the interference of the mates. The crew were standing around at this time, manifestly countenancing and encouraging Sheridan in his conduct. The captain immediately ordered Sheridan to come aft. Several of the crew said he should not; among them were Brown, Hemmer, and Gulliver, the latter of whom began to strip off his jacket, and said, "If you are going to take anybody aft, we will see." The captain being unable, with the assistance of his officers, to enforce his order to have Sheridan brought aft, retired to his cabin, and having washed himself, came afterwards on deck, and ordered all the crew to come aft. They accordingly came; and he then required that they should deliver up Sheridan; which they strenuously refused, first generally, and afterwards upon a particular demand from each of them, separately; and stated, that Sheridan should not be delivered up. The captain then ordered Sheridan not to perform any more duty on board; and dismissed the others of the crew to their duty. A consultation was immediately had in the cabin, by the captain, officers, and passengers, as to what was best to be done upon the present exigency, and it was their unanimous opinion that the ship ought to put into the first port; they thinking that there was a deliberate conspiracy among the crew to commit a revolt. At this time, and for several days after, it blew a severe gale, so that they could not put into the Cape of Good Hope; and on this account alone the ship afterwards put into St. Helena, and there Rodman and Sheridan were put ashore and dismissed. After the affray of the 8th, the crew, with the exception of Sheridan, performed their duty as usual; but the master and officers swear, that they were always in expectation of a mutiny, and took precautions to suppress it, until after the arrival of the ship at St. Helena.

Such is a summary of the more important facts, upon which a jury of the country have passed a deliberate judgment, and with the result of that judgment I am entirely satisfied. The case appears to me to be one, in which

there was an unquestionable endeavour, by the libellants, to make a revolt on board of the ship; in the first place, by a combination to support Rodman in his attempt to intimidate the captain in the discharge of his duty in the management and control of the provisions of the ship; in the second place, by assisting and encouraging Sheridan in his gross and brutal attack upon the captain; and in the last place, by their deliberate determination, after their passions were cooled, to resist orders, and to prevent Sheridan from being put in custody by way of punishment, for the enforcement of the discipline of the ship.

What then are the consequences, which the marine law attaches to offences of this nature? It is said, that they carry with them a forfeiture of all the wages of the offending seamen; and for that purpose, the language of the eminent judge, who now presides in the court of king's bench, in his excellent work on the Law of Shipping, has been cited. "It seems," says he, "that neglect of duty, disobedience of orders, habitual drunkenness, or any cause which will justify a master in discharging a seaman during a voyage, will also deprive him of his wages." [2] In a limited and restricted sense the proposition here stated may be, and doubtless is, true. But it is not a single neglect of duty, or a single act of disobedience, which ordinarily carries with it so severe a penalty. There must be a case of high and aggravated neglect or disobedience, importing the most serious mischief, peril, or wrong: a case calling for exemplary punishment, and admitting of no reasonable mitigation; a case involving a very gross breach of the stipulated contract for hire, and going, in its character and consequences, to the very essence of its provisions. The only authority, cited in support of the proposition by the learned author, shows, that it must have these limitations attached to it. Lord Stowell, in the case of The Exeter, 2 C. Rob. Adm. 261, 263, where the charges made against a mate, suing for wages, were, "drunkenness, neglect of duty, and disobedience," said, "these are certainly offences of a high nature, fully sufficient to justify the discharge, if proved. In respect to the negligence it would not be necessary to prove that it was wilful negligence; it would be sufficient if it appeared to amount to that habitual inattention to the ordinary duties of his station, that might expose the ship to danger; for the person in Robinet's station stipulates against such negligence." Here the learned judge manifestly relies on the inflamed character of the offence, and the habitual recurrence of it. In the same manner he deals with the subject of drunkenness, visiting the forfeiture, not on a single act, but upon such a habit as was conclusive proof of disability for general maritime employment. In respect to disobedience, the

_____

[2] Abb. Shipp. pt. 4, p. 457, c. 3, § 4.

cause did not require the learned judge to advert to any such distinction, for while he spoke of disobedience to lawful command (especially in an officer), as an offence of the grossest kind, the only act of disobedience alleged, was the refusal to leave the ship upon an unjustifiable dismissal by the master, which the court treated as wholly insufficient to defeat the claim for wages. I should be sorry indeed to lay it down, as a general proposition, that any act of disobedience by a seaman, however slight, is of course to be visited with a forfeiture of wages, or will justify a master in dismissing him in the course of the voyage. Such a principle, it seems to me, would be very disastrous to the commercial interests of the country, and would involve so many difficulties in its application, that the denial of wages would soon, from the necessities of the case, with reference to the ordinary habits of seamen, introduce an essentially different contract into maritime employment. My opinion is, that the disobedience must either be an act of a very gross nature, involving serious danger, a mischief, or malignancy; or it must be habitual, and produce such a general diminution of duty, as goes to the very essence of the contract. Severe as the old maritime laws [3] were, they ought not to be construed as justifying a more extensive interpretation; and the milder spirit of modern times has introduced principles, which appear to me more fitted to preserve good order on board, and at the same time to encourage a policy, which aims at the suppression of crimes by taking away the motive for obstinate perseverance in misconduct. The Consolato del Mare (chapters 159, 160, 161) contented itself with declaring, that every seaman was bound to execute the orders of the master, without affixing any penalty to mere disobedience; but when the seaman sought a quarrel with the master, it punished him with the loss of half his wages and his goods on board; if he lifted his hands against the master, it required the crew to seize, bind, and imprison him, and punished the refusal with the loss of wages and goods; and if he struck the master in anger, it punished him with the loss of every thing. In these provisions there is a progressive severity, which does not visit every offence with a total forfeiture of wages; but reserves it only for heinous offences. If we may trust to the law of France, as expounded by Pothier, a very mitigated rule prevails in that country. It is said by him, that the master may discharge a mariner for intemperance, want of capacity, for being a blasphemer, a thief, refractory, or quarrelsome, so as to cause disorder in the ship, &c. and in such case he has no claim for wages, except for the services rendered before his

discharge; he can claim none for those services he has failed to render.[4] It would not seem, from these remarks, that Pothier contemplated any general forfeiture of wages in the cases stated by him; and Valin, in his Commentaries, has not adverted to any, except so far as they are authorized by the text of the French ordinance.[5]

Those judges, in our own courts, who have been called most frequently to administer this branch of law, have certainly not felt themselves bound to inflict the forfeiture of wages for slight misbehavior, whether by disobedience or negligence; and even aggravated offences and very gross acts have been dealt with in a cautious and indulgent spirit.[6] It appears to me that there is much in the reasoning of these enlightened persons, that cannot fail to commend itself to every maritime court. I confess myself not scrupulous in admitting, that my own judgment is satisfied with the principles on which they have acted. I should be sorry to lay it down as a settled rule, that even the commission of the offence of endeavoring to make a revolt, punishable, as it is, by fine and imprisonment under our laws, is, in all cases, to be visited with a total forfeiture of wages. Cases may easily be conceived, where the seamen have, in a legal sense, committed the offence, and yet under such circumstances of gross provocation and misconduct on the part of the master, as to form a very strong excuse, addressing itself to the conscience and mercy of the court. And where seamen have been guilty of inflamed offences, and serious violations of duty, under circumstances of an aggravated nature, if they testify by their subsequent conduct a thorough repentance and contrition; if they apologize for, and offer amends for the wrong, and justify a confidence in their sincerity by subsequent, exemplary diligence, there is no stubborn rule of law that prohibits the court from mitigating the forfeiture, and giving them the whole, or a portion of their wages, according to its discretion. Such, as I understand them, are the principles incorporated into the old maritime codes, and adopted and practised upon by a pretty uniform course of opinion in the tribunals of our own country.[7] These principles appear to be countenanced by decisions of the common law in analogous cases; though it might be sufficient, on the

---

[3] See Laws Wisbuy, art. 24; Laws Oleron, art. 12; Cleirac ad Loc. p. 29; Roughton's Arts. 25; Clerke, Praxis Adm. 129.

[4] Pothier, Louage de Matelots, art. 209, Cush. Transl. p. 128.

[5] 1 Valin, bk. 2, tit. 7, arts. 5–8.

[6] See the cases cited under the next note 7.

[7] Drysdale v. The Ranger [Case No. 4,097]; Sprague v. Kain [Id. 13,250]; Humphreys v. The America [Id. 6,869]; Atkins v. Burrows [Id. 618]; Whitton v. The Commerce [Id. 17,604]; Thorne v. White [Id. 13,989]; Black v. The Louisiana [Id. 1,461]; Relf v. The Maria [Id. 11,692]; Dixon v. The Cyrus [Id. 3,930]; Johnson v. The Eliza [Id. 7,383]; Abb. Shipp. (note to Story's Ed. 457) 525; Laws Wisbuy, art. 25; Laws Oleron, art. 12; Roughton's Arts, 25; 15 Vin. Abr. "Mariners," A, 2, D, F; Mal. Lex. Merc. p. 104, c. 23; Moll. bk. 2, p. 242, c. 3.

present occasion, to say that the law has done nothing to repudiate them in respect to maritime contracts.[8]

In the present case, the conduct of the libellants was without any adequate excuse or apology. It is in proof, that there was a sufficiency of good provisions on board, which were dealt out to the full allowance, by the orders of the master, during the whole voyage. If, on a few occasions, any deficiency occurred, it was unknown to the master, and not designed on the part of his immediate agent. As to the times and manner, in which fresh provisions were to be furnished, he was the proper judge, and in the exercise of this reasonable discretion he does not appear to have been guilty of any error or misconduct. There was no harshness, or unfeeling denial, and no desire evinced to give the crew less than a just share of what was slaughtered. Under such circumstances, the affray of the 8th of June must be considered as having its origin in a mutinous spirit, endeavouring to work its way to improper indulgencies by intimidation and force. The necessary tendency of such conduct was to put a most valuable cargo (near 300,000 dollars in value) in jeopardy, and to place the officers and passengers in a state of anxious and inconvenient alarm. The co-operation of the libellants, in the malignant attack of Sheridan upon the captain, and their subsequent aid in screening him from punishment, by deliberate combination and active assistance, are acts of such a nature, as make the legal offence assume a very aggravated character. I think I should not perform the duty, which the law requires of me on the present occasion, if I did not pronounce, that it ought to be visited by a forfeiture of the wages antecedently earned.

An attempt has been made to carry forward the forfeiture to the time of the arrival of the ship at St. Helena, upon the ground, that the officers were obliged to employ extraordinary precautions, and that the mutinous spirit of the crew was not subdued until the leaders were dismissed at that port. But there does not appear to me any sufficient evidence to sustain this part of the case. All the crew performed their duty faithfully after the affray, during the remainder of the voyage; and the measures of the officers, however discreet, arose from suspicions from the past, and were not called for by any subsequent acts of the crew. If a forfeiture were to be inflicted under such circumstances, it would be because the fear of injury is, in contemplation of law, equivalent to the actual commission of gross offence. The forfeiture can attach to no wages except those earned antecedently to the affray.

But it has been urged, on behalf of the libellants, that admitting the forfeiture, justly attached to these wages, they are still entitled to recover them, because there has been a remitter to their original rights by the voluntary act of the captain. It is said, that he has pardoned their offence, and for the encouragement of the crew, in the discharge of their duty, has agreed to bury their past misconduct in oblivion. If this allegation were supported by the evidence, I should have no difficulty in applying the rule already hinted at in their favor. The master is the general agent of the owner, in respect to the management and navigation of the ship, and has authority, so far as affects the contract of the seamen for wages, to stipulate with them for a remission of their faults, and to reinstate them in their rights.[9] It is sound policy to intrust him with such an authority; and the maritime law upholds its exercise with a steady confidence. If it were otherwise, on many occasions the ship would be deserted, and the voyage be defeated, for want of a suitable crew to navigate her. If no subsequent good conduct could purge the forfeiture, and no services, however cheerful and constant, could redeem the fault, what motive would there be for seamen to remain by the ship, in her perils or disasters, especially when the subsequent earnings might be scarcely worth a moment's consideration.

My difficulty is, in drawing a satisfactory conclusion as to the fact of remitter, from the evidence in this case. If the master had been able to obtain other seamen at St. Helena, at a reasonable rate, and had omitted so to do, his conduct in retaining the libellants, after so gross a fault, might well be deemed, in the absence of all counter proof, a presumptive waiver of the forfeiture, and an implied forgiveness. In cases of desertion, the subsequent receiving of the offender on board, without objection, has been often admitted as equivalent to a pardon or remitter [10] and the principle, which governs in that case, may well be applied to forfeitures arising from other misdemeanors. But it is in proof, that at St. Helena no other seamen could be obtained; and the master, therefore, was compelled to retain the libellants on board, or to break up the voyage. His act of retainer therefore, after an opportunity to discharge the offenders, does not possess such a significancy, as may well be attributed to it under ordinary circumstances. Then, as to the declarations, imputed to the master on his departure from St. Helena, they are very imperfectly proved, and at most import no more than that if their subsequent conduct was good, he would use them well; but if otherwise he would put into some other port, and discharge them there. Taking these expressions in connection with the actual necessity of retaining them, they fall short of the pur-

---

[8] See Beale v. Thompson, 4 East, 546, 563; Miller v. Brant, 2 Camp. 590.

[9] Miller v. Brant, 2 Camp. 590.

[10] Miller v. Brant, 2 Camp. 590; Beale v. Thompson, 4 East, 546, 565; 15 Vin. Abr. "Mariners," D. F.; Atkins v. Burrows [supra]; Whitton v. The Commerce [supra].

pose of establishing a remitter or pardon. Indeed upon this occasion the crew did not make any promises of future good conduct; and never, at any time, expressed any contrition for their offence, or offered any amends. If, before their arrival at St. Helena, they had so done, it might have given a very different complexion to the cause, and have entitled them to a very indulgent consideration from the court. In the actual posture of the facts, the allegation of a remitter or pardon does not appear to me to be established in any satisfactory manner. The forfeiture remains, therefore, with its fullest legal effect.

A farther claim is made against the libellants for the actual expenses occasioned by the stopping of the ship at St. Helena, and also for demurrage during the time of her detention. Under the circumstances, I have no doubt that the call and stay at St. Helena was a very proper and justifiable act on the part of the master, and such as sound prudence dictated. But still there is some difficulty in admitting this adminicular claim for compensation. If the forfeiture of wages had been waived, the ground of claim for compensation for actual expenses and losses would undoubtedly have remained in full force; for it is not necessarily included in such a remitter. But as the forfeiture is insisted on, the question arises, whether the court ought to give a full compensation ultra the forfeiture, or draw the compensation from the forfeited fund. Now the forfeiture authorized by the marine law, in cases of this nature, is not given to the owner as a mere boon; but is designed to operate primarily as a warning penalty upon the seamen for misconduct; and secondarily, by way of compensation for the supposed or actual losses of the owner. If the forfeiture exceeds the injury to the owner, there does not seem to be any particular equity calling upon the court to go farther; if it falls short of the injury, then justice requires that the seamen should make such additional compensation as is equivalent to the unsatisfied amount of the injury. In both cases the penalty operates with great severity upon the seamen; and, for the purposes of civil justice, seems sufficiently extensive. In flagrant cases, too, the party is subjected to a criminal prosecution; and thus, in effect, may undergo a double punishment. No authority in the marine law has been distinctly pointed out, justifying the present, as a substantive claim, ultra the forfeiture of wages. I am not prepared to admit the justice or convenience of such a principle. I will not say that a case may not arise, in which the court, looking at the atrocity of the offence, may not properly visit it with the cumulated load of forfeiture and compensation. But there is an equity, addressing itself to the court on the present occasion, which cannot be overlooked. The libellants, independently of this claim, will suffer a punishment fully equal to their misconduct. I am not willing to be instrumental in making it more oppressive. My judgment accordingly is, that the demurrage and expenses at St. Helena ought to be allowed to the owners; but in case the amount does not exceed the forfeited wages, the indemnity is to be sought out of that fund. Conjectural loss of profits or of interest, in consequence of the supposed increase of the length of the voyage, has been already intimated, at the argument, to be inadmissible upon principle. If the markets had risen in price, or the ship had avoided a storm, or made her passage more speedily in consequence of the delay at St. Helena, the seamen could not have interposed these as equitable off-sets to the claim for compensation. They rest on too uncertain a basis; and are incapable of an uniform adjustment, so as to constitute an equity for both parties.

We may next proceed to the consideration of the objections which peculiarly belong to some of the libellants, and are inapplicable to the rest.

First. As to Hemmer. It is asserted in the pleadings, that he was guilty of an infraction of the ship's articles by trading with the natives of the Northwest Coast and Sandwich Islands, &c., and thereby forfeited his wages, as well as all the goods he had on board. Upon inspection of the articles, it appears that the crew are expressly prohibited from such traffic, under the penalty of a forfeiture of all their wages, and all their goods and effects on board of the ship.[11] How far the law would enforce such a penalty as to the goods or effects on board, in case an attempt were

[11] The article is in the following words: "And the master, officers, seamen, and mariners of the said ship Mentor do further contract and agree with the owners of said ship in the manner following, to wit, that neither the said master, officers, seamen, and mariners, nor any of them, shall, on any pretence or pretext whatever, purchase, sell, barter, or traffic with the natives of the Northwest Coast, or Sandwich Islands, or with any other person or persons whatever, for furs, sandal wood, or any other articles of trade of what name or nature whatever; or shall receive from the said natives or others, any furs, sandal wood, or other articles of trade as presents; hereby agreeing, that all trade and traffic at all places and times during the voyage, is to be for the exclusive benefit and profit of the owners of said ship. And the said master, officers, seamen, and mariners, hereby agree, for themselves, their heirs and assigns, that if they, or any of them, be found to have infringed this article of the agreement, they are thereby to forfeit all their wages, together with all their goods and effects on board said ship, to the use and benefit of the owners thereof. And the owners do agree, that whoever shall give information to the conviction of any one concerned in breaking this article, shall receive one half of the sum due the delinquent."

William Woodward, carpenter, $14 per month—entered 22d June, 1822; advanced before sailing $28; advanced abroad $50.

Henry Hemmer, seaman, $11 per month—entered Feb. 4th, 1823; advanced abroad $11.

William Brown, seaman, $10 per month—entered Dec. 7th, 1824; advanced abroad $17.50.

Artemas Gulliver, seaman, $11 per month—entered Jan. 26th, 1825.

made to sue for the same in a court of justice, I am not called upon to decide; and, as at present advised, I should feel no inconsiderable difficulties on the subject. Forfeitures in civil cases are generally odious, and not unfrequently mitigated in courts, professing to act in equity, as this court does, sitting in admiralty. The act of trading is substantively proved; and the seizure of the furs, which constituted the object of the traffic, was accordingly made by the master upon search, while the ship was at sea on her voyage to Canton. But after the arrival of the ship at that port, the master, upon full deliberation, released the furs, and delivered them back to the offender; and this being an act which, as agent of the ship, he was competent to do, I am of opinion that the forfeiture was remitted to all intents and purposes, and can no longer subsist as to the wages or goods. It appears, that, with the proceeds of the furs, Hemmer afterwards purchased silks at Canton, which were brought home in the ship, and landed at Boston. But this, of itself, constitutes no offence, and may be considered as presumptively licensed by the master. Hemmer's wages, therefore, since the affray, are not affected by these transactions; and as to antecedent wages, the forfeiture, if it could attach at all, could only affect wages earned at the time of the traffic, and these would be completely swallowed up in the later and efficient forfeiture, by the endeavour to make a revolt on the 8th of June.

Secondly. As to Woodward. He shipped as carpenter for the voyage; and an attempt has been made to establish that he was not competent to perform the duty. It does indeed appear, that the master was on the outward voyage dissatisfied with him, and gave a superior authority to the carpenter's mate, and employed Woodward principally, but not entirely, in the ship's common duty. But whenever business of this sort was carried on, he always assisted in the carpentry; and there is no pretence to say, that he laboured under any general incapacity. On the contrary, a person with whom he worked ashore, has spoken favorably of his capacity; and no fact, except of slowness, has been established against him. I must be permitted to say, that when a man ships in any particular capacity on board a ship, it is not for slight causes that he is to be degraded or compelled to perform other duty. He is not to be subject to the caprice, or distaste, or petulance of the master. He stipulates for fair and reasonable knowledge, and due diligence; but not for extraordinary talents. If he is guilty of fraud or misrepresentation, he is doubtless subject to all just consequences. But when he acts bona fide, and is willing to perform his duty, if he should be more tardy in his movements than other men, it constitutes no just ground for degradation. The master has shown no sufficient reason in this case for placing his own mate over him; and if he had refused, under such circumstances, to perform the additional seamen's duty imposed upon him, I am not satisfied that he would not have been entirely warranted in law. But since he was somewhat acquainted with seamanship, and performed his duty as carpenter when required, and as seaman on all other occasions, there is no legal ground upon which the full wages stipulated in his contract as carpenter ought not to be paid to him. Of course, as one of the offenders in the affray of the 8th of June, his wages antecedently earned are forfeited.

These are all the observations, which I think it necessary to make in the case; and I shall accordingly refer it to a commissioner to ascertain the wages now due to the libellants upon the principles already stated.

The defence has been very properly made, and being in its main point sustained, I do not feel myself under all the circumstances, called upon to give any costs in the case. Each party must accordingly bear his own costs. Decree accordingly.

[This cause was again heard on exceptions to the commissioner's report. Case No. 9,428.]